May it please the Court, my name is Michael Chase. I am the attorney for the Appellants Global Commodities Trading Grp. and the insurance company of the State of Pennsylvania, Philadelphia. I'm sorry, I said communications and I meant commodities, so slip of the tongue. I'd like to reserve five minutes for rebuttal, Your Honors. The District Court erred here by not finding the minimum contacts necessary to support personal jurisdiction in California. This is a case that involves a large amount of business activity. It's not a one-time purchase of an automobile off eBay, as in the Busquedo case cited by the District Court. The analysis has to proceed individually with each defendant, and I'll talk about the main defendant first. The defendant, Beneficio De Arroz Choloma, SA, which is also called Mechosa by the parties, engaged in tens of millions of dollars of business with a California corporation based in California. The business occurred over a span of five years, and in none of those years did they purchase less than 20 metric tons of commodities. They singled out and solicited the seller for most of the activity. They knew where the seller was located. They had their officers there at least on three occasions. They wanted the seller not just to ship goods directly to them. It was more than that. These were CIF contracts, so the seller didn't just push a button and ship the commodities throughout the United States, acquire the commodities, pay for them, lay out the money for them, arrange for the shipment, the transportation to a port, arrange for insurance, arrange for inspections. All of this activity was occurring in California, and then the performance was complete when the commodities were put on the ship and left the United States for Honduras. The last couple of sales of rice and corn that give rise to this dispute, where the defendant failed to pay, left the seller holding the bag for over seven million dollars of commodities. The buyer has acknowledged that they had this five-year relationship, acknowledged that they have left the seller unpaid and caused the seller damages from demerged charges at the port in Honduras, and they promised to pay. We think it is absolutely clear that they had to expect that California's courts would have an interest in adjudicating this failure to pay. Help me understand the nature of the relationship between the company and the two who signed the note, Andoni and Jarufi. The two individual defendants are officers of the BOCHOSA, and were personally involved in the meeting in December of 2011. Are they also owners or just officers? I believe the record reflects they are owners, but I'm not 100 percent sure on that, Your Honor, actually. I do not know about the ownership issue, just that they were officers, and they were personally involved in these transactions. They weren't just associated with the company and aren't being sued just because of an association. Their personal involvement, and I can turn to that. With respect to, I think it's Jarufi in particular, your position in the amended complaint is that she didn't personally sign the guarantee that her signature was forged. So what, maybe you would address her personal involvement in the support jurisdiction? Yes, Your Honor. Well, first of all, Global received a signed guarantee from BOCHOSA that had her name purportedly signing a guarantee, as well as a certification that the Board of Directors had approved a note, and had no reason to expect to hear later that she had not indeed signed it. And so that is knowledge, obviously, particularly within the defendant's knowledge, and we don't think we have to take their word for it at this stage of the litigation, and alternative pleading is absolutely appropriate in this specific case where you have that situation. If there's, you know, there's evidence that it was her signature because it was requested that she sign it, and it was returned to us with her signature on it. We think that constitutes some evidence of her personal involvement. She also personally was involved in the December 2011 meeting in California at the offices of Global, and so there's really enough evidence of her personal involvement to warrant personal jurisdiction over her, even if she didn't sign the note. And that's because of her role in the broader course of dealing? Correct, Your Honor. So we think that turning back to the corporation, and then I will also return to the individuals, but turning back to the corporation, I don't know if it's actually the corporation, the S.A., the Bacchosa entity, we think that the conduct here, the massive amount of conduct is purposeful availment under the Burger King case and under this case, this Court's case in Roth. What's the status of the defendant, S.A.? That is to say, are they, do they have enough money to satisfy any judgment that might be entered against them? That evidence isn't in the record for that. I mean, they have pled, you know, an inability to play, pay, and they've said they are unable to pay, but I mean, again, that's why. Hence your interest in going after the individual defendants. Yes, Your Honor. But not only this, the Burger King case, which we think is very similar here and even, you know, had fewer connections, but this Court's case in Roth versus Garcia Marquez, where the focus was on the fact that even though this, in that case, the filming of the novel at issue was going to be done in South America, or in Central America, that the performance in California was going to be very substantial, just like here, where you've got a lot of performance in California. We think the District Court didn't learn the lesson of Burger King, which is that physical absence from the State is not dispositive when you're talking about specific jurisdiction and due process. That now, and this is even in the 80s, before the Internet, but, you know, nowadays, business is conducted over the wires and over the telephone, and you can't just say, well, I didn't physically come there and avoid being hauled into a court in another state or in another location to defend claims. In Burger King, you had one of the individual franchisees had not even been to Florida, and so that Court, the Supreme Court, still said that his activities were sufficiently directed at Florida, even though he was going to be opening franchises in Michigan. As far as the proposed forgery claim, we think that the Court didn't actually allow us to amend the complaint to add that claim, but we think that the Court should have, and that the Court's denial of leave to amend was incorrect, and it should be reviewed de novo, because of the denial was based on futility and not on any kind of a discretionary grounds. But we really don't think there's any argument in this Court that the forgery claim does A forged document, apparently, according to their own testimony in this action, a forged document was sent to California deliberately to induce a California company to extend further credit. So as far as the individual defendants, one, I think, dispute we have with the interpretation of the case law with the defendants is that there is no corporate officer shield or fiduciary shield in personal jurisdiction law. There may be in state substantive law, but in Davis v. Metro Productions, which they cite in favor of their position, this Court actually said, no, you don't consider the fact there might be a substantive defense that somebody signed a document or took some action as an officer of a corporation. If they're personally involved in the business at hand, whatever would be the contact with the forum, then they can be sued under personal jurisdiction law, whether they have a meritorious defense on substance is a different issue. But we think that Defendant Anthony Reyes, the husband, his evidence is clear. He traveled to California at least three times to meet with and met with the company in California. There's a dispute over whether he principally came to the United States in order to visit with the company, or if he had other purposes, tourism, et cetera. But we think the Roth case addresses that and deals with both individual defendants and the Roth case said they had other reasons to come to California, and this Court said that. Before your time runs before the time you want to save for rebuttal, could you address form nonconvenience? Yes, Your Honor. This Court has said that form nonconvenience is an exceptional tool to be employed sparingly, and that was the Ravello-Monegro v. Rosa case. We think that there's a strong presumption in California that the case stay here because you have not just a California plaintiff, but a United States second plaintiff. In the Boston Telecommunications Group v. Wood case, this Court said that for that analysis, it's not just who's in the state, it's who else is in the country. And the Boston Telecommunications case said, ordinarily, the plaintiff's choice form will not be disturbed unless the private interest and the public interest factors strongly favor trial in a foreign country. I think the arguments on the factors here are laid out in the briefs, and they're probably pretty typical of these kinds of cases. But I would point out that the amount of inconvenience and expense that the defendants would incur having to litigate in California is relatively small in this case compared to the amount in dispute. And why should we resolve that question instead of sending it back to the District Court to resolve it? The District Court didn't reach it, of course. That's correct. We think it's teed up, and we think it's just efficient for that to be resolved here. The briefing is fully completed on that. The evidence is in the record on that. And I think the other side agrees that it just makes sense for this Court to resolve it at the same time. Thank you, Counsel. Thank you. Good morning, Your Honors. Brent Hadaway of the Law Firm of Diaz-Reyes of Miami, Florida, on behalf of the Yapalese. And let me pull up my technology here. The trial court correctly dismissed this case based on a lack of personal jurisdiction over the defendants. But I'd like to begin by addressing something that came up in Counsel's argument, which was the distinction between the individual defendants and the corporate defendants, which we have referred to as bachosa. The argument of appellants has tended to lump them all together into one group, as if each of them had contacts with California that equally applied to the other and vice versa. That's not really appropriate. You have to look at their contacts individually. And here, when you look at the individual contacts of each individual defendant, the conclusion is clear that none of them purposely availed themselves to jurisdiction in California. Now, appellants' jurisdictional allegations are based on three written instruments. These documents called the Act, the Note, and the Guarantee. Now, Counsel has argued that there was this prior history of transactions between these parties. But in the specific jurisdiction analysis, you're really not allowed to look at anything beyond what arises from or relates to the actual contracts at issue. Counsel, I thought Burger King says exactly the opposite. It doesn't say we're supposed to look at, there they said, prior negotiations and contemplated future consequences, along with the terms of the contract and the party's actual course of dealing. So, it's not just the one instrument that forms the basis for the claim, is that right? Well, Burger King was very, very different, and you have to think about it like this. Burger King was a franchise relationship. There was a single contract which governed the franchise relationship, and there were others entering into that franchise relationship, and the franchise contract contemplated a relationship that would go on for 20 years. Here you're talking about discrete orders of goods, and this is something that happens all the time. And if you put the shoe on the other foot, imagine you're a company that's ordering widgets from Mexico from time to time. You may order them on a regular basis, but there's no ongoing contractual relationship each order is a separate contract. And what they've alleged here is that there was this order for rice and corn, and that there was this particular contractual relationship, and that these instruments, the Act, the Note, and the Guarantee, if you basically construe their allegations in their favor, what it really amounts to is that these instruments were ratifications of what they say was an antecedent debt under that particular rice and corn contract. So to go back and say, well, you can also plug in each time in the past they ordered commodities from this particular company, that's really not correct, and there's no case law out there that actually says you can do that. You know, I'm not sure that I agree with you in terms of what the case law says. It seems to me that a continuous course of dealing between an out-of-state entity and someone in-state is relevant, even though the course of dealing may involve one contract after another. You're saying that I can't look at any part of the earlier course of dealing in a determining jurisdiction? Well, again, there's no case that I'm aware of that says, when you have discrete orders for commodities like this, that that constitutes... What do you mean by discrete? That is to say, this is a contract, the one that was defaulted on, this was a contract that was one in a long series of contracts. They were separate contracts, but it was a long course of dealing between these two companies. Well, whether you characterize that as a long course of dealing, certainly they had had transactions in the past. Well, okay. Do you dispute the long, or do you dispute the course of dealing? Well, I dispute that that is what course of dealing means in the Burger King context. What, you know, the way the employees read Burger King is that you look at the contract, what was the course of dealing that led to the formation of that contract? What was the course of dealing that involved performance under that contract, and what were the future consequences that were contemplated under that contract? Now, here they sued on these three instruments that ratified what they say was a debt owed under one or two contracts, orders for rice and for corn, that were discrete orders for and the future consequences that were contemplated were simply the payment of money that they say was already owed. And so the Burger King test, it's not, this is not something that's contemplating a more intimate sort of franchise relationship as this court applied in the Vons case. It's something that's much more arm's length. And it's also notable that the negotiations occurred by email and telephone, and none of the instruments were signed by Mr. Andoni Reyes or Ms. Jarruffe in his or her individual capacity. Mr. Andoni signed the act and the note in his capacity as the owner and legal representative of Bachosa, but never in his individual capacity. And the instruments were written in Spanish and were not governed by California law, at least not on their face. Now turning to, again, to the individuals, Ms. Jarruffe, we'll start with her. She's a citizen of Honduras. Nothing in the records suggests that she purposefully availed herself of being sued in California. Now there were allegations to be, that could be construed in plaintiff's favor that she attended a meeting, one meeting in California, but the operative complaint itself said that she was attending there in her corporate capacity. And now the allegations against Ms. Jarruffe are solely based on the guarantee, her signature to the guarantee. But appellants here could never get their story straight. At first they came out with an affidavit alleging that she signed it. And there may be a reason they can't get their story straight, because the facts at the moment are unclear. Either she signed it or it's forged. Well and that's the problem, is that she denies having signed it. They say, I don't know. If you say, I don't know, or on information and belief, this court has said that that's not competent evidence. And so the trial court was not required to construe those allegations in favor of plaintiff because plaintiff really didn't have any competent evidence. Who made what representations earlier on that this was in fact her signature? I don't know if there's anything in the record saying that that was her signature. What Mr. Andoni testified to in his affidavit was that Mr. Velasquez, the principal for Global said, look guys, I need you to sign up some documents for my bank so I can get some funding here. Can you please sign these for me? And Mr. Andoni said, sure, I'll sign them for you. But it was never his intent to acquiesce to this debt. Nevertheless, of course, that's something that goes to the merits. I'm not sure you answered my question. Maybe you don't know the answer to my question. It's possible I don't know. Maybe if you could ask again. I'm sorry, Your Honor. Well, my question is, what led the plaintiff to believe that this was Ms. Harufi's signature? Besides the fact that there's a name typed and then there's a signature. I don't know what's in his mind. I mean, what he said in his subsequent affidavits was he saw a signature on where her signature block was indicated and he assumed it was her signature. That's what he said. And apparently, somebody sent him the documents after he'd said, would you please sign the documents? Yes. I mean, it wasn't as though this just came out of nowhere. Right. Right. Somebody on the defense, what's now the defense side, sent those documents containing what may or may not have been her signature, but certainly purported to be the signature. It purported to be her signature. But you know, the problem is that, you know, what does that tell you if it was whether it purported to be her signature or not? She denied signing it. Now, if she did sign it, I don't ask you to concede, but if she did sign it, do you concede jurisdiction? No. No, because you have to look at the other factors. She, the document was signed in Spanish. She's in Honduras. She had, according to Plano's version of the story, she attended one meeting in her personal capacity. Now, that doesn't, none of that means that, you know, simply because something that, assuming she did sign it and it was sent by email to California, this court has said that that sort of contact is not sufficient to establish jurisdiction. She had to have done something to affirmatively reached out that would purposely, have purposely availed herself to jurisdiction here. And even if she did sign it, that would not be sufficient to confer personal jurisdiction over her. If we were to conclude that her signature, assuming it's a valid signature, and whatever other factors might connect her to California, are enough for personal jurisdiction. If we, I don't ask you to concede that that's the appropriate decision, but if we were to conclude that that's so, how does that conclusion change, if at all, based upon her contention that her signature is forged? How does that change the... The jurisdictional analysis, if at all, based on her contention that, in fact, she didn't sign? Right. It really doesn't. And I think that the best way to look at it is to take a look at your opinion in Dole, which was about a fraudulent conspiracy between individuals in Europe that was directed at a California company. And the key, and that was applying the Calder Direct Effects Test, but I think it's instructive for the Purposeful Availment Test when we're talking about the guarantee and whether or not she signed it. The key to your opinion in Dole is that the actions of these defendants in Europe induced reliance to the detriment of the California company, Dole, meaning there was some change in circumstances that Dole made, or a decision Dole made to change circumstances in reliance on what these guys were doing to its detriment. Here, there's no reliance, there's no detrimental reliance because it didn't change the circumstances according to... Well, no, I think it did. That is to say, based upon the documents signed by the two individual defendants, the plaintiff company was allowed to get financing. And the financing was either a good idea or a bad idea, depending on whether they were going to be paid by the defendants. And the defendants end up not paying. So I think we had a consequence, that is to say, the signatures on these pieces of paper did have real-world consequences here in California. I don't know that that's in the record. Maybe I missed that, but I... It has to be sort of two plus two makes four. I don't know... I'm not familiar with that being part of the record, that that was the consequence, that they did get funding and that that had any detrimental effect on Global down the road. What Global has said is the fact that they didn't get paid has led to them going out of business. But that was... What they say is that that was an existing debt in the first place. They say that was an obligation that my client Bacchosa had before these instruments were signed. And so I think if you look at that in the context of European and Dole, there is no detrimental reliance there. And of course, and that goes to the question of Mr. Antoni Reyes himself, the allegation, of course, that his statement that he signed, and I see my time is running down. So let me just ask if there are any questions you'd like me to touch on before I go on. I did want to ask, if we were to conclude that there is personal jurisdiction here, do you agree with the plaintiffs that we should go ahead and resolve the forum non-convenience question? Or do you think that should be left? It's fully briefed and the record below. And this court has said actually in the Dole case, again, it was a similar circumstances where there was a fully briefed record on forum non that the trial court did not rule on and this court took it up and ruled on it. And so this court is in a position to do that. And I see my time is about up. So if there are nothing further, we respectfully ask that the ruling be affirmed. Thank you. Thank you. Thank you. We agree with the court's apparent interpretation of Burger King. Burger King itself actually did involve multiple contracts, including one franchise agreement. And the dollar amounts that were going under those contracts were actually far smaller than the dollar amounts in this case. But Burger King does say you look at a course of dealing as this court has just described. I would also point out that in the MOU that Pachosa wrote or signed on to the Memorandum of Understanding, which said that Global and Pachosa have maintained a business relationship since 2007. That was signed in 2012. The relationship has been successful and is based on mutual trust and respect. And there's also evidence in the record that Global would not have given these very favorable credit terms on this contract that is at issue in this case if they hadn't had that lengthy relationship. The terms were shipment of millions of dollars of commodities, and you don't have to pay for six months. I mean, that's a pretty favorable term for the buyer. And then they extended it again when they got the note and the guarantee. As far as Defendant Harufi docs, she may or may not have signed the guarantee. I don't think it's ruled out on the record that she might have authorized her husband to sign her name to it if she wasn't present at the time it needed to be signed. And so we would be looking at that in this case as well. And there's no evidence in the record that she denied that she signed the certification as Secretary of the Corporation that the note was approved by the Board of Directors. And one last point on personal jurisdiction. I didn't get into something in the brief that I wish I had now. But one of the factors in deciding whether it's reasonable to exercise personal jurisdiction is the availability of an alternative forum. And in this case, we have now the Honduras courts, the trial court and the Court of Appeals dismissing a case between the parties based on statute of limitations. And although the defendants have said they would waive statute of limitations if this court were to grant the motion to dismiss for form of nonconvenience, we don't have that similar agreement if the court were to dismiss it on personal jurisdiction. And so that largely is a big impact on the fact that there is maybe not an alternative forum in Honduras because of statute of limitations issues down there at this late date. Unless the court has any other questions, we'll submit it. Thank you, counsel. Thank you. Thank you both for your arguments today. The case just started to be submitted for decision. And I'd like to thank the high school students who are here watching today. We'll be in recess. All rise. The case is submitted. Thank you.
judges: Thomas, W. Fletcher, Miller